IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>DeSHAUN ANDERSON,<br><br>    Defendant. | No. CR15-0046<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.   INTRODUCTION ................................. 1

II.  PROCEDURAL HISTORY ........................... 2

III. RELEVANT FACTS ............................... 2

IV.  DISCUSSION ................................... 5
     A.  Was the Vehicle Stop Valid? .............. 6
         1.  Probable Cause for Traffic Citation .. 6
         2.  Reasonable Suspicion of Drug Activity  8
     B.  Could Defendant be Ordered to Exit His Vehicle? ..... 9
         1.  Dog Sniff ............................ 9
         2.  Defendant Instructed to Exit the Vehicle ....... 10
     C.  Was the Pat-Down Search Authorized? ..... 11
     D.  Summary ................................. 12

V.   RECOMMENDATION .............................. 13

## I. INTRODUCTION

On the 25th day of June 2015, this matter came on for hearing on the Motion to Suppress (docket number 13) filed by the Defendant on June 15, 2015. The Government

was represented by Assistant United States Attorney Dan Chatham. Defendant DeShaun Anderson appeared in person and was represented by his attorney, F. Montgomery Brown.

## II. PROCEDURAL HISTORY

On May 14, 2015, Defendant DeShaun Anderson was charged by Indictment with possession with intent to distribute heroin. Defendant appeared on May 20 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on July 13, 2015.

On June 12, a Superseding Indictment was filed adding co-Defendant Max Julian Wright to the action, and charging Defendant with possession with intent to distribute heroin and Fentanyl (Count 1), conspiracy to distribute heroin and Fentanyl resulting in serious bodily injury (Count 2), and distribution of heroin and Fentanyl resulting in serious bodily injury (Count 3).

On June 15, Defendant timely filed the instant motion to suppress. The Government filed its resistance on June 19. Because of the superseding indictment, the addition of co-Defendant Wright, and the pending motion to suppress, the trial was continued to August 24, 2015.

## III. RELEVANT FACTS

In April 2015, Investigator Nick Nolte of the Cedar Rapids Police Department was asked by the Narcotics Bureau commander (Sgt. Dave Dostal) to investigate a "rash of heroin overdoses." On April 10, Nolte and Dostal met with Cameron Weber, an inmate in the Linn County Jail.[1] Weber had overdosed on heroin in January 2015. Weber told Nolte that he had obtained the heroin from an individual known as "Shady," who Weber believed may live in the area of Westdale Court Apartments. Weber also reported that

---

[1] On direct examination, Investigator Nolte testified that he "initially" interviewed Weber on April 10. On cross-examination, however, Nolte said he met with Weber on April 3, and again on April 10.

Shady drove a light blue minivan, with a license plate that included the letters CPV. Weber could not recall the numbers on the license plate. Following the interview, Nolte and Dostal drove to Westdale Court Apartments in an effort to locate a vehicle matching that description. They were unsuccessful.

Three days later, on April 13, Investigator Nolte learned that a female had overdosed at Westdale Court Apartments and was taken to Mercy Hospital. Nolte went to the hospital to interview the overdose victim. After Nolte was at the hospital for a very short time, however, he was contacted by Sgt. Dostal and instructed to respond to Westdale Court Apartments, where a second overdose victim had been located. During his investigation, Nolte learned from the first victim that she had obtained the heroin from "Shady," and she then gave some of the heroin to the second victim. The first overdose victim survived, but the second overdose victim died.

The following day, April 14, Sgt. Dostal informed Investigator Nolte that the vehicle described by Cameron Weber had been located at Westdale Court Apartments. Dostal advised Nolte that the vehicle was registered to Defendant DeShaun Anderson, but that the vehicle registration had expired. Nolte and Dostal obtained a photo from Defendant's driver's license and went to the jail, where they showed it to Weber. Weber told Nolte that the person in the photo was "Shady" — Weber's source for heroin. Weber also advised Nolte that he had seen Shady near a white house at the corner of A Avenue and 13th Street.

Investigator Nolte then proceeded to the corner of A Avenue and 13th Street, where he sat for several hours conducting surveillance. At approximately 12:45 p.m., Nolte observed a light blue minivan pull into the driveway of a white house located at the corner of A Avenue and 13th Street. Almost immediately, a female came out of the house and got in the van, where she remained for 3-5 minutes. The female then exited the van and returned to the house. As the female was walking back to the house, Nolte observed that

her arm was bent at the elbow, with her hand near her head. Nolte believed this was consistent with an intravenous injection. Nolte, who had previously served for four-and-a-half years on a DEA Task Force, believed that he had likely witnessed a drug transaction.

When the minivan left the area and headed eastbound on A Avenue, Investigator Nolte caught up to the van and confirmed that the license plate matched the plate number given earlier by Sgt. Dostal. Because he was in plain clothes and driving an unmarked car, Nolte called for a uniformed officer to conduct a traffic stop. According to Nolte, Defendant's vehicle was being stopped for two reasons: Nolte believed that the vehicle had an expired registration, and Nolte believed that the occupant of the vehicle was involved in drug activity.

Officer Justin Boecker of the Cedar Rapids Police Department initiated the traffic stop on I-380 southbound, near the Wilson Avenue exit. Investigator Nolte pulled up directly behind Boecker's squad car. Boecker approached the van on the driver's side, while Nolte approached the van on the passenger side. Defendant was driving and was alone in the vehicle. Boecker apparently obtained Defendant's license, registration, and insurance, and returned to his squad car to process a citation for operating without valid registration.[2] During that time, Nolte remained near the minivan and engaged in "small talk" with Defendant. Nolte testified that "I didn't want any evidence to be destroyed."

Meanwhile, Officer Boecker called on the radio for backup assistance. Officer Justin Kaczinski testified that he heard Boecker ask for assistance because, while the minivan was pulling to a stop, Boecker observed the driver engage in "nonconforming movements." Specifically, Defendant was seen reaching back behind his seat. Kaczinski arrived at the scene approximately six minutes after the initial stop, spoke briefly with Boecker (and was told by Boecker that a K-9 unit was coming), and then stood by.

---

[2] Because his body microphone was apparently not on, there is no audio recording of this initial encounter.

4

Officer Buckles, who works with a drug detection dog, arrived approximately three minutes later. Buckles intended to have his dog conduct a "free air sniff" around the exterior of the vehicle. Defendant was asked to exit the van for this process to begin, and he complied. At that point, Defendant had been stopped for ten minutes. Defendant walked with Officer Kaczinski to a grassy area between the van and Officer Boecker's squad car. Kaczinski asked Defendant if he had "anything on him that I needed to be concerned about." Defendant said no, but Kaczinski then asked if he could "pat him down." Defendant agreed. Defendant was wearing shorts and high socks. As Kaczinski was patting down Defendant's socks, he felt a bulge. When he rolled the top of the sock down, Kaczinski saw several white rocks in plastic baggie "corners."

Officer Kaczinski then yelled for "Nick [Nolte]" and grabbed Defendant's right arm. Defendant reached down with his left hand, however, and retrieved the material found in his sock. As the officers converged on Defendant, he placed the material in his mouth. The officers told Defendant to "spit it out," and were able to retrieve four individually wrapped "rocks" from his mouth. Defendant told officers that it was possible that he had swallowed 3-4 rocks. Accordingly, Defendant was transported to the hospital by ambulance. After Defendant left for the hospital, a search was conducted of the minivan. Additional contraband and cash were located.

## IV. DISCUSSION

Defendant asserts in his motion to suppress that his "detention, frisk and questioning constituted an unreasonable seizure of the Defendant without reasonable and articulable cause to believe he had or was committing a criminal offense."[3] Defendant argues further that any consent to search his person or his vehicle "was the fruit of the prior illegal seizures of the vehicle" and, therefore, did not justify the subsequent warrantless

---

[3] Defendant's Motion to Suppress (Docket Number 13) at 2, ¶ 4.

5

searches.[4] The Government argues that the vehicle stop "was justified both by the traffic violation and the drug investigation."[5] The Government also argues that Defendant consented to a pat-down search.

While not a model of clarity, Defendant's motion would appear to require the Court to answer three questions: Was the vehicle stop valid? Could Defendant be ordered to exit his vehicle? Was the pat-down search authorized?

### A. Was the Vehicle Stop Valid?

In his motion to suppress, Defendant initially seems to acknowledge the validity of the vehicle stop.

> *While the initial motor vehicle stop was valid*, the subsequent detention, frisk and questioning constituted an unreasonable seizure of the Defendant without reasonable and articulable cause to believe he had or was committing a criminal offense.

Defendant's Motion to Suppress (docket number 13) at 2, ¶ 4 (emphasis added). Later in his motion, however, Defendant seems to assert that the vehicle was illegally seized.

> Any alleged consent to search the Defendant, or his vehicle, *was the fruit of the prior illegal seizures of the vehicle*, its occupant and possessions and, therefore, were ineffective to justify the warrantless searches that followed.

*Id.*, ¶ 6 (emphasis added). Accordingly, the Court will consider whether the vehicle stop was valid.

### 1. Probable Cause for Traffic Citation

It is well-established that "[b]ecause a vehicle stop constitutes a seizure under the Fourth Amendment, an officer must have at least articulable and reasonable suspicion that the vehicle or its occupants are involved in illegal activity before conducting the traffic

---

[4] *Id.*, ¶ 6.

[5] Government's Brief (docket number 16-1) at 7.

stop." *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008). Even a minor traffic violation provides probable cause for a traffic stop, "even if the traffic violation is a pretext for other investigation." *Id.*

In his brief, Defendant seems to concede that officers had a valid basis for the traffic stop, but argues that "there was no reasonable suspicion to detain the Defendant beyond issuing him a traffic citation for driving an unregistered vehicle."[6] While acknowledging that he "was the subject of some measure of investigation for involvement in narcotics activity," Defendant argues the officers "lacked the requisite reasonable suspicion to detain longer than necessary to effectuate the ticket event and perform an invasive 'frisk'."[7]

While Defendant seems to concede the validity of the vehicle stop in his motion and brief, Defendant's counsel questioned Investigator Nolte at length regarding the citation for driving without valid registration. By his cross-examination, counsel seemed to suggest that Defendant's registration may not have been expired, but was, instead, within a "grace period." Defendant offered no substantive evidence on this issue, however, and Nolte testified that given Defendant's birth date in February, the registration would have expired on March 1 and the grace period ended on April 1 (14 days prior to these events). Accordingly, to the extent Defendant may be challenging the validity of the vehicle stop, the argument fails.

I also note parenthetically that even *if* Investigator Nolte was mistaken regarding the status of Defendant's expired registration, the vehicle stop would nonetheless be valid. "Mistakes of law or fact, if objectively reasonable, may still justify a valid stop." *United States v. Gaffney*, \_\_\_\_\_ F.3d \_\_\_\_\_, 2015 WL 3691121 (8th Cir., dec. June 16, 2015)

---

[6] Defendant's Brief (docket number 13-1) at 3.

[7] *Id.* at 5.

7

(quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012). Here, Sgt. Dostal checked a database available to the Cedar Rapids Police Department and determined Defendant's registration had expired. Dostal relayed that information to Nolte. Even *if* Defendant's registration was *not* expired — and there is no evidence to that effect — I find that such mistake of fact is objectively reasonable and, therefore, the traffic stop was valid.

### 2. Reasonable Suspicion of Drug Activity

The Government argues alternatively that the traffic stop was valid because Investigator Nolte had "articulable and reasonable suspicion that the vehicle or its occupants" were involved in the distribution of narcotics. Whether there is reasonable suspicion to justify a vehicle stop "is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). *See also United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) ("In forming a basis for suspicion, officers may 'draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that may well elude an untrained person.'").

Here, two different overdose victims identified "Shady" as their source for heroin. One of the victims was able to describe the vehicle being driven by Shady. Using a photo ID, the same victim was able to identify Defendant DeShaun Anderson as the person who had provided the heroin. Immediately prior to the vehicle stop on April 14, Investigator Nolte witnessed what he reasonably believed to be a narcotics transaction near a house on the corner of A Avenue and 13th Street. Accordingly, Nolte had an articulable and reasonable suspicion the occupant of the van was involved in drug activity, thereby authorizing further investigation.

It is not clear whether Defendant is claiming that the vehicle stop was invalid. If such a claim is being made, however, it is without merit. Probable cause existed to

believe that the vehicle was being operated without valid registration. That reason alone justified a vehicle stop, even if it was a pretext for further investigation. Moreover, the officers had a reasonable and articulable suspicion that Defendant had just been involved in the distribution of narcotics. In short, I find that the vehicle stop did not violate the Fourth Amendment.

### B. Could Defendant be Ordered to Exit His Vehicle?

Next, while it is not entirely clear, Defendant appears to argue that his removal from the vehicle was violative of the Constitution. The facts in this regard are undisputed. While Officer Boecker was processing the citation for driving without a valid license, Officer Buckles, who works with a drug detection dog, arrived at the scene. Buckles arrived approximately eight-and-a-half minutes after Defendant was initially stopped. Approximately ten minutes into the stop, Defendant was asked to exit his vehicle, and he complied.

#### 1. Dog Sniff

Initially, Defendant argues that "the valid traffic stop transformed into an extended detention of the Defendant, beyond what was reasonable to handle the traffic violation, violating the Constitution's 'shield against unreasonable seizures,'" citing *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 1612 (2015).[8] The *Rodriguez* Court considered whether a traffic stop could be extended to permit a dog sniff.

> A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called ' *Terry* stop' than to a formal arrest." Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" — to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it

---

[8] Defendant's Brief (docket number 13-1) at 6.

9

may "last no longer than is necessary to effectuate th[at] purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed.

*Rodriguez*, 135 S. Ct. at 1614 (all citations omitted).

Here, Officer Boecker attended to the issuance of a traffic citation, while other officers spoke with Defendant. Boecker had not completed the citation process when Officer Buckles arrived with his dog, nor can it be argued that Boecker should reasonably have been completed with the task by that time. *Rodriguez* does not prohibit dog sniffs, it simply holds that a motorist cannot be delayed for that purpose. Because the anticipated dog sniff in this case did not delay the vehicle stop, *Rodriguez* is not implicated. Defendant's argument that the vehicle stop was unduly delayed must fail.

### 2.  *Defendant Instructed to Exit the Vehicle*

I now turn to the issue of whether officers could require Defendant to exit his vehicle to facilitate the dog sniff. According to Investigator Nolte, Defendant was "asked" to get out of the vehicle, and he complied. It has long been the law that an officer conducting a traffic stop may order the driver to exit the vehicle. As the Supreme Court observed in *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), "[r]ather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both." More recently, the Supreme Court confirmed that during a routine traffic stop, an officer "may order out of a vehicle both the driver and any passengers; [and] perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998) (citations omitted). Accordingly, I believe ordering Defendant out of his vehicle did not violate the Constitution.

### C. Was the Pat-Down Search Authorized?

The law regarding pat-down searches during traffic stops was recently summarized by the Eighth Circuit Court of Appeals:

> "Officers may conduct a protective pat-down search for weapons during a valid stop when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" "In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." "A pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" "In examining the relevant facts and inferences, we must keep in mind that 'minimally intrusive weapon searches' at traffic stops will more likely be reasonable because of the 'inherent danger' of traffic stops."

*United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) (citations omitted) (quoted with approval in *United States v. Gaffney*, ____ F.3d ____, 2015 WL 3691121 (dec. June 16, 2015)).

Here, officers were dealing with more than a "routine traffic stop." While the stop was authorized because there was probable cause to believe the vehicle was being operated without valid registration, officers also had information that its registered owner, Defendant DeShaun Anderson, was involved in the distribution of heroin. Immediately prior to the stop, Investigator Nolte observed what appeared to be a drug transaction. In determining whether there is a reasonable basis to believe a subject is armed and dangerous, courts view the facts under an objective standard, and consider the totality of the circumstances known to the officer at that time. *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007). It is not necessary for the police officer to be "absolutely certain that the individual is armed, rather the issue in determining the legitimacy of the search is 'whether a reasonably prudent [person] in the circumstances would be warranted in the

belief that his safety or that of others was in danger.'" *United States v. Abokhai*, 829 F.2d 666, 670 (8th Cir. 1987) (quoting *Terry v. Ohio*, 392 U.S. 1, 37 (1968)). *See also United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002).

At an investigatory stop, when an individual is suspected of drug involvement, it is reasonable for a police officer to believe that the individual may be armed and dangerous. *United States v. Robinson*, 119 F.3d 663, 667 (8th Cir. 1997). *See also United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."). Here, officers had information that the registered owner of the vehicle was involved in the distribution of heroin. In addition, officers had information which reasonably suggested that the vehicle had just been involved in a drug transaction. Based on the totality of the circumstances, I believe that a reasonably prudent person in such a situation would be warranted in the belief that the sole occupant of the vehicle may be armed and dangerous. Therefore, whether or not Defendant consented to a pat-down search, Officer Kaczinski was justified in attempting to perform a pat-down search of Defendant for officer safety.

## D. Summary

In summary, I believe that the stop of Defendant's vehicle on April 14, 2015 was not violative of the Constitution. Not only did officers have probable cause to believe Defendant had committed a traffic offense (operating without valid registration), they also had reasonable and articulable suspicion to believe Defendant had just conducted a drug transaction. Accordingly, officers were authorized to stop the vehicle and investigate further. Once the vehicle was stopped, officers were authorized to order Defendant to exit the vehicle, with or without a dog sniff. Because Officer Boecker was still processing the citation, there is no evidence that the anticipated dog sniff with Officer Buckles extended

the traffic stop. Finally, given all of the circumstances, a reasonably prudent person would be warranted in his belief that his safety or that of others was in danger, thereby authorizing a minimally intrusive pat-down search. I find no constitutional violation here.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 13) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on June 25, 2015.*

DATED this 30th day of June, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA